**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TONI ALEXANDRA EVOLA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:13-cv-0104** |
| | ) | |
| **CITY OF FRANKLIN, TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | **Judge Haynes** |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff Toni Alexandra Evola submits this memorandum in support of her motion for summary judgment against Defendant City of Franklin, Tennessee, ("Defendant" or "the City") on Plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq.* ("FMLA"). The undisputed material facts demonstrate that Defendant violated the ADA by discharging Plaintiff based upon a disability and by failing to engage in good faith in the interactive process when to do so would have resulted in a reasonable accommodation, and to reasonably accommodate her disability. Further, the undisputed material facts demonstrate that Defendant interfered with Plaintiff's exercise of her FMLA leave, and /or discharged Plaintiff in retaliation for her use of protected leave. Accordingly, Plaintiff respectfully requests that the Court grant her motion and direct that this case proceed to trial for a determination of damages.

**FACTS**

**(Fact citations of "Fact # " refer to paragraph numbers in Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, filed contemporaneously herewith)**

Plaintiff began working for Defendant on or about June 17, 2002, as a police officer in the patrol division of the Franklin Police Department. (Deposition of Shirley Harmon ("Harmon Dep.") at 15, l. 20-22; Federal Rule of Civil Procedure 30(b)(6) Deposition of Eric Stuckey ("City Dep.") at Ex. 3; Pl.'s Dep. at 9); (Fact #1).Plaintiff was elevated to the designation of Field Training Officer ("FTO") with increased pay on October 27, 2006. (Fact #2). Plaintiff received a promotion to Detective, Major Crimes Unit, Criminal Investigation Division on December 13, 2007. (Fact #3). Plaintiff received positive performance evaluations in her positions as patrol officer, FTO, and Detective, indicating that she was competent to perform the essential functions of her jobs, both before and after she became disabled. (Fact #4).

As a police officer, and especially as a criminal investigations detective in the Major Crimes Unit, Plaintiff encountered a number of situations and events that were emotionally traumatic and in fact while a detective was "absorbed in death." (Fact #5). Beginning in December, 2008, Plaintiff began experiencing a number of unexplainable physical health problems including panic attacks, pain in her limbs, dizziness, shortness of breath, nausea, vomiting, and insomnia. (City Dep. Ex. 32). After an extended period of time being exposed to investigating deaths in her job, and a particularly traumatic incident involving service of a warrant, a member of Plaintiff's family who was very close to Plaintiff died. (*Id.*; Pl.'s Dep. at 94). In March of 2009, Plaintiff applied for and received FMLA leave and was diagnosed with post-traumatic stress disorder ("PTSD"). (Pl.'s Dep. at 17; City Dep. Ex. 32.). Stress aggravates Plaintiff's PTSD, and Plaintiff was under a lot of stress in her position with Defendant. (Pl.'s Dep. at 64-65). As a symptom of her PTSD, Plaintiff suffers from interrupted or fitful sleep and nightmares, which often leaves her groggy and tired when she wakes up in the morning. (Pl.'s Dep. at 63-65). Plaintiff also suffers from panic or anxiety attacks as a symptom of her PTSD. (Pl.'s Dep. at 66). Plaintiff takes Paxil and Benedryl for her disability. (Pl.'s Dep. at 68). Plaintiff takes Benedryl on an "as needed" basis to help her sleep. (Pl.'s Dep. at 68-69). Plaintiff

2

took time off to deal with stress on many occasions after she returned to work from her FMLA leave for PTSD, and filled out the appropriate paperwork and requested FMLA leave whenever she needed to be absent from work due to her PTSD. (Fact # 30). It was the policy of the City of Franklin to assign FMLA leave any time an employee needed time off for illness. (Fact #29).

Immediately upon her diagnosis with PTSD, Plaintiff told her supervisor, Sgt. Don Zelaya. (Fact #8). Plaintiff also told her chain of command and the City, through Human Resources, about her diagnosis. (Pl.'s Dep. at 72; Facts #19-23). Plaintiff would occasionally have to take time off because she suffered from PTSD (Plaintiff's Declaration), and Sgt. Jack Morgan took a negative view of Plaintiff's use of such time off. (Pl.'s Dep. at 24; Facts #27, 45).

After her March 2009 break to manage her PTSD, Plaintiff perceived that she was "under attack" by the department, suffering from "increased scrutiny" even for "unfounded" complaints. (Pl.'s Dep. at 78). On or about July 31, 2009, Plaintiff received a reduction in pay and grade by having her Field Training Officer status revoked, and having her trainee removed from her responsibility. (City Dep. at 42-43, Ex. 11; Moore Dep. at 40; Haufmann Dep. at 15-17). This reduction was based on a citizen's desire for Officer Evola's supervisor to be made aware that she had been "loud" on a traffic stop. (Haufmann Dep. at 16, l. 21-25). Sgt. Haufmann recalled that the citizen "didn't want Officer Evola to get in trouble." *Id.*

In October of 2009, Plaintiff was involved in an incident that occurred at an ATM. The bank customer had called police to report money removed from her account without authorization. Plaintiff allegedly questioned the customer. (Pl.'s Decl. at ¶5). It later turned out the customer's boyfriend had withdrawn the funds. *Id.* The facts met the pattern of someone trying to scam the bank, and Plaintiff's procedures helped to prevent such a scam. *Id.* Based on the foregoing, despite her request to be handled in accordance with General Order procedures which would have made a referral to the Employee Assistance Program for counseling, Plaintiff was scheduled for a psychological

3

fitness for duty examination with Dr. Brenda C. Rambo in November of 2009. (City Dep. at 25-32). The examination found her "fit for duty and ready to return to her position with the Franklin Police Department." (City Dep. Ex 32). Dr. Rambo's examination report, which indicated that Plaintiff had been diagnosed with PTSD, came into the possession of Defendant through Police Chief Jackie Moore, and the Human Resources department. (Moore Dep. at 64-70; Harmon Dep. at 71). Chief Moore testified that it was his policy when officers suffered from stress to weed them out and "terminate them." (Moore Dep. at 33).

In May of 2010, Plaintiff had a conversation with an attorney in Juvenile Court which resulted in Plaintiff's receiving discipline. (City Dep. Ex. 33-37). The attorney had betrayed a trust Plaintiff had placed in the attorney by using things Plaintiff had told the attorney in confidence prior to a hearing against Plaintiff in the court hearing, and Plaintiff told the attorney not to count on Plaintiff's cooperation in the future. (City Dep. Ex. 33). The attorney, whose name was Karen Johnson, asserted that Plaintiff had behaved in a threatening manner. (City Dep. 33, 34). In an investigation of the incident, Plaintiff denied threatening Ms. Johnson, gave Plaintiff's version of events which was different from Johnson's, and submitted to a Certified Voice Stress Analysis test ("CVSA") which determined that Plaintiff did not threaten Ms. Johnson and had been honest in all aspects of the investigation. (City Dep. Ex. 33-35). Nevertheless, Plaintiff received discipline. (City Dep. Ex. 36). Even though EAP was requested, it was not provided. (City Dep. Ex. 37).

On Wednesday, April 20, 2011, Plaintiff went to an H. G. Hills Supermarket shortly before closing and parked her police cruiser in the fire lane adjacent to the storefront for safety and convenience before going inside to try to purchase some food. (Pl.'s Dep. at 112-13; City Dep. Ex. 40). Plaintiff had solved many crimes that had occurred at that store during almost a decade of service with the police force, and had observed a disheveled man seated on a park bench on the sidewalk in front of the store shortly before it was time for the store to close for the night. (Pl.'s Dep. at 112-13;

4

City Dep. Ex. 40). When a young grocery clerk behaved disrespectfully toward Plaintiff over Plaintiff's minor fire lane parking infraction on her way out, Plaintiff left but then returned to explain to the young clerk why Plaintiff had chosen to park in the fire lane. (Pl.'s Dep. at 118). Plaintiff also spoke to the store manager, and recorded the conversation, wherein the store manager told Plaintiff that the manager "was alright with [Plaintiff's] interaction with her employee." (City Dep. Ex. 40). Plaintiff told her supervisor Sgt. Morgan of the incident upon her return to the station, and offered to play the recording. *Id.* Sgt. Morgan declined to hear the recording and told Plaintiff that the recording would not matter anyway, so Plaintiff deleted the recording in accordance with her normal procedure. *Id.*; (Morgan Dep. at 25). After giving the interview further thought, Sgt. Morgan decided to make "serious issues" of it. (City Dep. Ex. 38). He informed superiors, and met with Plaintiff and Sgt. Todd Stamper six days later on Tuesday, April 26, 2011. *Id.*

Sgt. Todd Stamper was Plaintiff's direct supervisor for approximately three years, including at the time of Plaintiff's termination. (Stamper Dep. at 21). Sgt. Stamper prepared Plaintiff's last performance evaluation, covering the time period from March 1, 2009 until March 31, 2010. (Stamper Dep. at 31). Sgt. Stamper rated Plaintiff from 3.75 (in the middle of the "meets expectations range") to 5.5 (in the "above expectations" to "role model" range). (Stamper Dep. at 32). Sgt. Stamper did not "notice any decline" in Plaintiff's performance after that evaluation. (Stamper Dep. at 41). However, prior to the H.G. Hills event, Sgt. Morgan noted what he called a "decline" in Plaintiff's job performance. (Morgan Dep. at 17). When asked what he observed, Sgt. Morgan stated that Plaintiff had "excess sick leave usage," noting that Plaintiff had "five occurrences of sick leave." (Morgan Dep. at 17-18).

As noted earlier, usage of sick leave automatically invoked FMLA leave at the City. Plaintiff had informed the City through Sgt. Zelaya that she was on medications including Ativan, Paxil, and Benadryl for her PTSD. (Pl.'s Decl. at ¶6). Following her return from FMLA leave for PTSD, most

of the times that Plaintiff called in sick, it was approximately an hour before her shift, and she made her superiors aware that it was because she was groggy from the medications. (Pl.'s Decl. at ¶4).

At the April 26, 2011 meeting with Sgt. Morgan and Sgt. Stamper, Plaintiff requested reasonable accommodations from Defendant. (Pl.'s Dep. at 77). Specifically, she requested them to place her in an administrative position. (Pl.'s Dep. at 77; City Dep. Ex. 38,39). Plaintiff also told them that she felt "burnt out," "stressed," and requested their help to find a less stressful position. (Pl.'s Dep. at 77-78, 81-82; City Dep. Ex. 38, 39).

Sgt. Stamper had been trained on how to recognize stress or burnout in subordinate officers. (Stamper Dep. at 12-13). He stated that he was trained to look for changes in appearance and a decline in performance to identify stress affecting an officer. (Stamper Dep. at 13). He also agreed that being a police officer is stressful. (Stamper Dep. at 17). He knew that Plaintiff had suffered from mental health issues and had received professional help for mental health issues prior to May, 2011. (Stamper Dep. at 19-20). He did not refer Plaintiff to EAP and did not document that EAP had been offered to Plaintiff. (Stamper Dep. at 24-25). Likewise, Sgt. Morgan did not refer Plaintiff to EAP. (Morgan Dep. at 54).

Sgt. Morgan had also been trained to look for stress and burn out in his subordinate officers noting that such disabilities can be identified by "poor job performance, poor decision making, excessive use of sick leave . . . ." (Morgan Dep. at 19). When Plaintiff requested accommodation, however, rather than initiating an interactive process with Plaintiff to search for a reasonable accommodation for her PTSD, Morgan made the decision to begin building a case against Plaintiff for the termination of her employment. (City Dep. Ex. 38). Specifically, Morgan went to the grocery store and solicited the clerk to come in to the station and fill out a complaint. (City Dep. Ex. 45; Morgan Dep. at 19,45 ("Q. So in the six days neither the manager nor the store clerk came to make a complaint to your knowledge? A. That's correct.")).

Defendant always appoints police officers to administrative positions when those officers have suffered injuries and/or need light duty work. (Pl.'s Dep. at 79; Stamper Dep. at 52; Fact # 46, 47). Sgt. Morgan has observed officers working in administrative positions for lengthy periods of time, up to eight or ten months. (Pl.'s Dep. at 29). Plaintiff was never given the opportunity to attend an EAP, even though she asked for a referral. (Pl.'s Dep. at 105-06).

Plaintiff used two days of sick leave prior to the April 26, 2011 meeting with Sgt. Morgan and Sgt. Stamper. (Morgan Dep. at 21; City Dep. Ex. 38). When they talked with Plaintiff about the H.G. Hills event, Plaintiff expressed to them that she was "emotionally distressed," she cried, and seemed "despondent." (Stamper Dep. at 45-46; City Dep. Ex. 39). Plaintiff told them that she was "tired" and "burned out." (Stamper Dep. at 47; Morgan Dep. at 28; City Dep. Ex. 38, 39). For Plaintiff to cry in front of him was "a telling point" for Sgt. Stamper. (Stamper Dep. at 48). Sgt. Stamper became "concern[ed]" about Plaintiff, enough so that he asked her to leave her firearm with him. (Stamper Dep. at 46; City Dep. Ex. 39). He perceived that Plaintiff needed "[i]mmediate leave" to address her emotional response. (Stamper Dep. at 50). Sgt. Morgan asked if Plaintiff would like to be placed on administrative duty, such as "working in dispatch." (Morgan Dep. at 28); (Stuckey Ex. 38). Plaintiff said she would like to be placed in an administrative position. (Morgan Dep. at 30; City Dep. Ex. 38). Sgt. Morgan told the deputy chief and Chief Rahinsky that Plaintiff was suffering from burnout and had asked to be placed in an administrative position. (Morgan Dep. at 31-32, 34; City Dep. Ex. 38).

Sgt. Morgan declined to listen to the recording of the H.G. Hills event, even though Plaintiff offered to play it for him. (Morgan Dep. at 24-25; City Dep. Ex. 38). The H.G. Hills employees did not file a complaint against Plaintiff on their own initiative; rather, Sgt. Morgan went to H.G. Hills to solicit the complaint from them after he learned that Plaintiff was suffering from burnout and wanted to be placed in an administrative position. (Morgan Dep. at 36; City Dep. Ex. 38). Sgt. Morgan had

never before solicited a citizen complaint on one of his officers. (Morgan Dep. at 43-44). Sgt. Morgan used the fact that Plaintiff had used nine sick days in the month prior to the H.G. Hills event as a factor in his decision regarding Plaintiff's employment and documented the usage of such time in his April 26, 2011, memorandum he prepared to give to his superiors. (Morgan Dep. at 33; City Dep. Ex. 38).

The increased scrutiny and the attacks that began in October of 2009 finally culminated in the termination of Plaintiff's employment effective June 10, 2011. (Pl.'s Dep. at 9). The actions Defendant used to support the termination decision were the ATM Incident, the Attorney Johnson incident, and the H. G. Hills incident. (City Dep. at 67-69). Plaintiff did not defend herself from the disciplinary actions that were building the case because Deputy Chief Larry Barnes had told Plaintiff early in her career and in "no uncertain terms, that it would be in my best interest, as a police officer, to not fight Chief Moore related to disciplinary action, to not request a hearing, or to follow the grievance procedure, because that would make the chief angry. It would agitate him. And that [Plaintiff] would be punished more harshly." (Pl.'s Dep. at 51-52). From that point, Plaintiff understood she was not to avail herself of the grievance procedure. (Pl.'s Dep. at 52). Plaintiff noted that it was the standard procedure of the department, i.e., that officers always waived any disciplinary hearing. (Pl.'s Dep. at 54-55).

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. at 323.

## LAW AND ARGUMENT

**I.**     **Plaintiff Is Entitled To Summary Judgment on Her ADA Claim.**

Because the events in this case took place after January 1, 2009, the ADA as amended by the Americans with Disabilities Amendments Act of 2008 ("ADAAA"). Pub. L. No. 110-325, § 4(a), 122 Stat. 3553 (2008) applies. Wurzel v. Whirlpool Corp., 482 Fed. Appx. 1 (6th Cir. 2012). Under the ADA "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "disability" means, (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1)(A)-(C). Since the passage of the ADAAA, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as -- medication . . . ". 42 U.S.C. § 12102(4)(E)(I). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

The term "qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A physical impairment is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems . . . ." 29 C.F.R. §1630.2(h)(l)(2011). Mental impairment means "[a]ny mental or

psychological disorder, . . . , emotional or mental illness, and specific learning disabilities." 29 C.F.R. §1630.2(h)(2). The term substantially limits means "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §1630.20)(1)(i)-(ii). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); see also 29 C.F.R. §1630.2(i).

A plaintiff can establish unlawful discrimination through failure to hire or promote, or through discharge, using either direct or indirect evidence of discrimination. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1184 (6th Cir. 1996). Use of indirect evidence invokes the burden-shifting analysis the United States Supreme Court introduced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Use of direct evidence makes the McDonnell-Douglas burden-shifting analysis inapplicable, and "traditional burdens of proof will apply." Monette, 90 F.3d at 1184. Claims for failure to accommodate, on the other hand, must be analyzed only under the direct evidence framework. Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 868-69 (6th Cir. 2007).

Direct evidence includes "evidence that the employer relied upon the plaintiff's disability in making its employment decision." Monette, 90 F.3d at 1185-86. To prove her claim of discrimination under the ADA using direct evidence, Plaintiff must show that she: a) is disabled; b) is otherwise qualified to perform the requirements of her position despite his disability, (i) without accommodation, (ii) with an alleged essential job requirement eliminated or (iii) with a proposed reasonable accommodation; and c) the employer bears the burden of proving that a challenged job

10

criterion is essential and a business necessity or that a proposed accommodation will impose and undue hardship. Monette, 90 F.3d at 1186. This framework applies to claims both for discharge, and failure to accommodate, using direct evidence. *Id.* at n.12. Plaintiff has direct evidence that Defendant relied on Plaintiff's PTSD both in making the decision to discharge her and in refusing to accommodate her disability. Chief Moore testified that it was his policy when officers suffered from stress to weed them out and "terminate them." (Moore Dep. at 33). Chief Rahinsky testified that Plaintiff was terminated out of a concern for placing the City at risk of incurring liability. (Rahinsky Dep.at 85-88).

In addition to incurring liability for ADA discrimination for discharging and failing to accommodate Plaintiff, Defendant is liable simply for failing to engage in the interactive process in good faith because a reasonable accommodation would have been possible. Lafata v. Church of Christ Home for the Aged, 325 Fed. Appx. 416, 422 (6th Cir. 2009).

### A. Plaintiff was "disabled" within the meaning of the ADA.

Plaintiff suffers from Post Traumatic Stress Disorder, a mental impairment which even when mitigated with medication affects her ability to sleep. Therefore, her disability affects the major life function of sleeping. *See* 29 C.F.R. §1630.2(i). When unmitigated, Plaintiff's debilitating PTSD substantially affected her ability to breathe, think, concentrate, communicate, and work. Plaintiff had a record of being disabled by means of Dr. Rambo's report of fitness for duty examination, which came into Defendant's possession in November of 2009. (City Dep. Ex. 32). In addition, Defendant regarded Plaintiff as being disabled because Defendant had received word of Plaintiff's PTSD diagnosis through her immediate supervisor Sgt. Zelaya, through Chief Moore's receipt of Dr. Rambo's report, and through the Human Resources Department's receipt of Dr. Rambo's report. There is no genuine issue of fact that there was a "grapevine" at the Franklin Police Department. (Morgan

Dep. at 54). Therefore, as of November, 2009, Defendant regarded Plaintiff as being disabled, and Plaintiff had a record of being disabled.

### 1. Plaintiff was impaired.

Plaintiff's PTSD means that she will live with the condition for the rest of her life. Evola depo at 68). Prior to getting her PTSD under control with medication, Plaintiff experienced panic attacks which prevented her from shopping for groceries, caused dizziness, shortness of breath, and nausea requiring hospitalization which kept her from working, and vomiting which prevented her from sleeping. (City Dep. Ex. 32). Plaintiff's FMLA paperwork on record with the City indicated she "may have periodic panic attacks which may require absence." (City Dep. Ex. 22). There can be no genuine dispute that Plaintiff's untreated PTSD impairment substantially limited the major life activities of sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working when unmitigated with medication and psychiatric therapy. *Id.* ("syncope" and "SOB"); (City Dep. at 73 ("SOB" means shortness of breath Ex. 32 at 281; a simple online search of the term reveals "syncope" means loss of consciousness). Plaintiff got her PTSD under control after she made the decision to check herself into the hospital for diagnosis and treatment, and continued with medication and psychiatric therapy. (City Dep. Ex. 32) (Plaintiff started taking medication and "sees her psychiatrist, Dr. Janes, once every three months."). Neither the episodic nature of her illness nor the ameliorative measures she has taken can be held against her in determining Defendant's liability. 42 U.S.C. § 12102(4)(D) & (E)(I). *See* Hoback v. City of Chattanooga, 2013 U.S. App. LEXIS 25482 (6th Cir. 2013) (upholding ADA discrimination verdict for police officer who brought PTSD under control).

### 2. Plaintiff had a record of being impaired.

The "record of impairment" provision of the ADA is intended to protect "people who have recovered from previously disabling conditions . . . but who may remain vulnerable to the fears and

stereotypes of their employers." Equal Opportunity Empl. Comm'n v. Daimler Chrysler Corp., 111

Fed. App'x 394, 404 (6th Cir. 2004) (quoting Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 509

(7th Cir. 1998)).  Dr. Rambo's report constituted a medical record, and it was in the possession and

awareness of Defendant. Dr. Rambo's report documented that Plaintiff had a history of a mental

impairment that substantially limited one or more major life activities.   Plaintiff, therefore, had a

"record of an impairment."  *See* MX Group, Inc. v. City of Covington, 293 F.3d 326, 339 (6th Cir.

2002).  This record came into the City and Chief Moore's possession, and was used in his decision to

weed out Plaintiff because of her stress.

### 3.  Defendant regarded Plaintiff as being impaired.

"To be liable under the "regarded as" prong as amended by the ADAAA, a defendant need not regard

an individual as substantially limited in a major life activity. 42 U.S.C. § 12102(3)(A). A plaintiff must only

show that he was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical

or mental impairment whether or not the impairment limits a major life activity." *Id.*; *Wurzel v. Whirlpool

Corp.*, No. 3:09CV498, 2010 U.S. Dist. LEXIS 36635, 2010 WL 1495197 (N.D. Ohio April 14, 2010), *aff'd*,

482 Fed. Appx. 1, 2012 U.S. App. LEXIS 8640, 2012 WL 1449683 (6th Cir. 2012)." Hoback v. City of

Chattanooga, 2012 U.S. Dist. LEXIS 124794, 13-14 (E.D. Tenn. Sept. 4, 2012), *aff'd*, 2013 U.S. App. LEXIS

25482 (6th Cir. 2013).  Plaintiff's actual impairment - PTSD - was the reason for Plaintiff's discharge.

Defendant's perception of Plaintiff as being disabled because of her PTSD was also the reason for its decision

to discharge her.  Plaintiff was qualified to do her job even without an accommodation.  Sec. B.1., infra.

Therefore, Plaintiff is entitled to summary judgment.

### B.      Plaintiff was otherwise qualified for her position despite her disability.

### 1.  Plaintiff was otherwise qualified without accommodation.

The ADA establishes that "if an employer has prepared a written description before

advertising or interviewing applicants for the job, this description shall be considered evidence of the

essential functions of the job." 42 U.S.C. § 12111(8). Defendant prepared written descriptions of both the patrol officer job and the job of detective. (City Dep. Ex. 1, 2). Plaintiff's job performance evaluations all established that she was capable of performing her job without any essential function being removed. (City Dep. Ex. 12-20).

After Plaintiff received her PTSD diagnosis in March of 2009, her immediate supervisor Sgt. Stamper evaluated Plaintiff's job performance from the period of March 1, 2009, to March 31, 2010. Stamper's evaluation rated her from meeting to exceeding expectations and even put her in the "role model" range. Stamper remained Plaintiff's supervisor until Plaintiff was terminated in June of 2011. Stamper testified in his deposition, which was taken on December 3, 2013, that after he performed Plaintiff's final evaluation, he did not notice any decline in her performance. (Stamper Dep. at 41). "She was completely back on track." *Id.* Chief Rahinsky testified that Plaintiff generally "did an above expectations consistent performance." (City Dep. at 88). Therefore, no genuine issue of fact exists that Plaintiff was qualified to do her job without any accommodation.

### 2. Plaintiff was otherwise qualified with an essential job requirement eliminated.

The only job requirement Defendant could possibly assert that Plaintiff could not perform was basically handling the three particular situations, the ATM incident, the Attorney Johnson incident, and the H. G. Hills incident, in a manner different than she did. Rahinsky testified there were "three incidents. Each slightly more egregious than the prior." (Rahinsky Dep. at 88). Leaving aside the pretextual nature of Rahinsky's viewpoint in light of the fact that there was nothing "egregious" in any of the three incidents, in all of the "dialogue" that Rahinsky testified took place over the decision to terminate the Plaintiff, nowhere is it mentioned that there was an interactive process with the Plaintiff herself. (Rahinsky Dep. at 87-89). Many jobs were available in the department that did not involve stress. Defendant easily could have accommodated Plaintiff by assigning her to a job that entailed less stress than she was enduring as a detective and as a police officer in the patrol division.

14

### 3. Plaintiff was otherwise qualified with a proposed reasonable accommodation.

Plaintiff was "otherwise qualified" to perform as a police officer, as she had served in such capacity for a number of years. (City Dep. Ex. 3, 4, 9, 12-15, 19, 20). Plaintiff was "otherwise qualified" to perform as a detective, as she had served in such capacity for a number of years after her promotion to detective from patrol officer. (City Dep. Ex. 16-18). Plaintiff's job performance evaluations proved she was capable of performing the essential functions of the job. Sgt. Todd Stamper, Plaintiff's direct supervisor, who evaluated Plaintiff for the time period from March 1, 2009 until March 31, 2010, which covered Plaintiff's diagnosis and treatment for PTSD, rated Plaintiff from 3.75 (in the middle of the "meets expectations range") to 5.5 (in the "above expectations" to "role model" range). (Stamper Dep. at 31- 32). Sgt. Stamper did not "notice any decline" in Plaintiff's performance after that evaluation. (Stamper Dep. at 41).

If Plaintiff had been afforded the reasonable accommodation of being allowed to "de-stress" from time to time with periods of administrative duty, she could have performed all of the essential functions of her position. (City Dep. Ex. 22 (recommending "followup appointments" and "periodic absences" to cope with stress)).

### C. Defendant cannot sustain its burden of proof either (1) that a challenged job criterion is essential, or (2) that the proposed accommodation would impose an undue hardship.

Under Monette, (1) If Plaintiff could perform the job with an alleged "essential" job requirement eliminated as set forth under section B.2. above, Defendant has the burden of proving that the alleged essential requirement that Plaintiff engage with the public in stressful situations actually was essential, and therefore a business necessity; and (2) on the other hand, if Plaintiff could have performed the job with a reasonable accommodation, Defendant has the burden of proving that Plaintiff's proposed accommodation would impose an undue hardship. Monette, 90 F.3d at 1186. If Defendant cannot meet either one of these burdens, Plaintiff is entitled to summary judgment. Defendant cannot meet the necessary burdens in this case.

**1. Defendant cannot prove that it could not provide Plaintiff with a job having periodic stress-free duties, or in which encountering stress, was not an essential requirement.**

Sgt. Morgan testified in his deposition that jobs were available in the Franklin Police Department where stress was not an issue. (Morgan Dep. at 50-51). Rahinsky explained the flex program. (Rahinsky Dep. at 27-28).

**2. Defendant cannot prove that providing Plaintiff with a less stressful job, or alternative periods of relief from stressful duty, would impose an undue hardship.**

Plaintiff's proposed reasonable accommodations were EAP and/or periodic assignment to administrative duty. Defendant admitted that both of those proposed accommodations were available, and neither of the proposed accommodations would have imposed an undue hardship. The EEOC guidance on *Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (EEOC Oct. 22, 2002) and the *Code of Federal Regulations* provide guidance on several factors that should be considered in making an undue hardship determination. 29 C.F.R. § I 630.0(p)(2)(i)-(v). They include: the nature and cost of the accommodation needed; the overall financial resources of the facility making the reasonable accommodation; the number of persons employed at this facility; the effect on expenses and resources of the facility; the overall financial resources, size, number of employees, and type and location of facilities of the employer (if the facility involved in the reasonable accommodation is part of a larger entity); the type of operation of the employer, including the structure and functions of the workforce, the geographic separateness, and the administrative or fiscal relationship of the facility involved in making the accommodation to the employer; and the impact of the accommodation on the operation of the facility.

In the case at bar, Rahinsky testified that the City of Franklin was big enough to have some flexibility in its law enforcement workforce. (Rahinsky Dep. at 27 ("We're a pretty good size. We've got 125 sworn. The fact that we have a flex team that exists allows us, obviously, to do some things a small agency wouldn't.")) Rahinsky went on to explain: "On any given day, there's already

16

flexibility in number of people scheduled. A shift may have 10, 11, 12 people working, but in addition, we may have two traffic units of K9, K9 Sgt., detectives. So one or two, three, four officers, it's not uncommon to have on light duty or FMLA for reasons, at any given time." (Rahinsky Dep. at 27-28). There can be no dispute that Defendant easily could have worked Plaintiff into the flexibility that already existed.

> **D.** **Defendant Failed to Engage in the Interactive Process in Good Faith, and a Reasonable Accommodation Would Have Been Possible.**

The ADA requires the employer to interact in good faith with the employee to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C. F. R. § 1630.2(o)(3). *See* Lafata v. Church of Christ Home for the Aged, 325 Fed. Appx. 416, 422 (6th Cir. 2009); Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871 (6th Cir. 2007) ("the interactive process is mandatory, and both parties have a duty to participate in good faith."). Defendant wholly failed to engage in the interactive process in good faith. When Sgt.s Stamper and Morgan informed Chief Rahinsky that Plaintiff wanted administrative duty, Chief Rahinsky simply made the decision to terminate Plaintiff's employment instead, without any further dialogue or consideration. Earlier, when Chief Moore had requested that Plaintiff be referred to EAP, it simply didn't happen. Plaintiff was subjected to a fitness for duty evaluation instead. Failure to engage in the interactive process can result in liability under the ADA if reasonable accommodations would have been possible. Burress v. City of Franklin, 809 F.Supp.2d 795 812-13 (M.D. Tenn. 2011) (citing Lafata, 325 Fed. Appx. at 422). Chief Rahinsky admitted that the accommodations were possible, because flex time was available, that administrative duty was available, and that the Defendant was big enough to handle that accommodation. Moreover, an employee is not required to use the "magic words" accommodation or disability to trigger the required interactive process; asking for continued employment can be sufficient. Id. In order to find a

reasonable accommodation, the employer must engage in good faith in an interactive process. <u>Kleiber v. Honda of Am. Mfg.</u>, 485 F.3d 862 (6th Cir. 2007).

The <u>Kleiber</u> court explained Sixth Circuit law governing the requirements for a good faith interactive process seeking reasonable accommodation under the ADA as follows:

> The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." *29 C.F.R. § 1630.2(o)(3)*. The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." <u>Id.</u> Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. US. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000), (en banc), *judgment vacated on other grounds*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). Even though the interactive process is not described in the statute's text,* the interactive process is mandatory, and both parties have a duty to participate in good faith. *Id.* at 1116; *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633-34 (7th Cir. 1998); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). When a party obstructs the process or otherwise fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer,* 100 F.3d at 1285 (quoting *Beck*, 75 F.3d at 1135).

<u>Kleiber v. Honda of Am. Mfg.</u>, 485 F.3d 862, 871 (6th Cir. 2007) (*footnote omitted).

**1. Defendant did not engage in the interactive process in good faith.**

The authorities that <u>Kleiber</u> relied on for establishing Sixth Circuit law, and others, provide a thorough explanation of the Defendant's responsibilities. "The process must be interactive because each party holds information the other does not have or cannot easily obtain. . . . [The] employer will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company. <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 316 (3rd Cir. 1999). Accordingly, an employer's failure to engage in the interactive process may, in itself, "constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." <u>Jacques v. Clean-Up Group, Inc.</u>, 96 F.3d 506, 515 (1st Cir. 1996). In fact, a qualified employee need not come forward with a reasonable

accommodation proposal of his own. "[I]t would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process." Taylor, 184 F.3d at 316. The employer shares the burden to find a reasonable accommodation because the employer "will often hold more information than the employee about what adjustments are feasible in the employee's current position." Id. The Taylor court explained:

> The interactive process, as its name implies, requires the employer to take some initiative . . . . The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome.

184 F.3d at 315-16. Further, "the burden [is] on the employer to request additional information that the employer believes it needs." Id.

Moreover, the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.'" McAlindin v. County of San Diego, 192 F.3d 1226, 1237 (9th Cir. 1999). The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "if a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." EEOC Enforcement Guidance on Reasonable Accommodation, at 7625. Thus, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative collaboration. See Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 771 (3d Cir. 2004)(stating that the hallmark of the interactive process is that it be "flexible").

In the case at bar, Defendant first became aware that Plaintiff had PTSD when Plaintiff was hospitalized in March, 2009 and told her supervisor, Sgt. Zelaya. Defendant knew at the latest when Defendant came into possession of Dr. Rambo's report in November of 2009. Defendant never requested any further information from Plaintiff about how to accommodate her disability. Rather, as Chief Moore, who would have received Dr. Rambo's report, testified, employees with stress are weeded out and "terminated." Of all the direct evidence that Defendant relied on Plaintiff's disability in refusing to accommodate her and in discharging her, that is probably the strongest. Instead of engaging in an interactive process after the attorney Johnson incident, Defendant disciplined her notwithstanding the interpretations of the CVSA by not just one but two specialists that Plaintiff was telling the truth. Stuckey Ex. 35 at 00772. Plaintiff requested accommodation following the H. G. Hills incident when Sergeants Morgan and Stamper conferred with her about the incident. Both of them documented the fact that she was asked if she would like an administrative position and that she said yes. Instead of engaging in an interactive process, Sgt. Morgan set out to make the final case for termination, and informed superiors. When Chief Rahinsky was informed, instead of engaging in an interactive process with Plaintiff and her health care providers, he decided she should be terminated, and she was terminated. (Rahinsky Dep. at 86). These actions do not demonstrate good faith.

> **2.      Had Defendant Engaged in the Interactive Process, a Reasonable Accommodation Would Have Been Possible.**

The ADA defines "reasonable accommodation" to include . . .

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Here, no dispute of fact exists that reasonable accommodations could have been made. Periodic assignment to the flex team and administrative duty were both available accommodations.

Fact ## 46-47. Plaintiff's FMLA paperwork said she would need "periodic" relief. Stuckey Ex. 22 at 00387. The Employee Assistance Program ("EAP") was an available accommodation as well. (Facts ## 15-18). Dr. Rambo's report said that EAP would be an appropriate accommodation if needed. (City Dep. Ex. 32 at 00286 ("...if ... her supervisors believe she in fact does have an anger management problem, it would be appropriate to make a referral for Officer Evola to attend the Employee Assistance Program and focus on anger management issues.")(finding her "fit for duty and ready to return to her position"). When the employer does not engage in the interactive process in good faith and a reasonable accommodation is available, the employer is liable. Lafata v. Church of Christ Home for the Aged, 325 Fed. Appx. 416, 422 (6th Cir. 2009). This reason alone is sufficient to entitle Plaintiff to summary judgment on the ADA claim. There is no genuine issue of fact that reasonable accommodation was available. Plaintiff is entitled to summary judgment.

## II.     The Family Medical Leave Act

The FMLA provides eligible employees with up to "12 workweeks of leave during any 12-month period" "[b]ecause of a serious health condition . . . ." 29 U.S.C. § 2612(a)(1)(D). An employee eligible for leave under the FMLA is one who has "been employed (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Defendant is a covered employer, and Plaintiff is an eligible employee. Facts ## 29-31; 50. PTSD is a serious health condition. Stuckey Ex. 32.

The Act prohibits an employer from "interfer[ing] with, restrain[ing], or deny [ing] the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). Further, the FMLA provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). An employee who believes her rights under the FMLA have been violated may

file suit in federal court. 29 U.S.C. § 2617. An injured employee may receive damages and equitable relief for violation of 29 U.S.C. § 2615. 29 U.S.C. § 2617(a)(1).

**A.   There is no Genuine Issue of Material Fact that Plaintiff Suffered Interference Under the FMLA.**

To state a prima facie claim of interference under the FMLA, a plaintiff must show that: (1) the plaintiff is an eligible employee; (2) the defendant is an employer covered by the FLMA; (3) the employee was entitled to FMLA leave; (4) the employee gave the employer notice of the employee's intention to take leave; and (5) the employer denied the employee FMLA benefits to which the employee was entitled. Edgar v. JAC Products. Inc., 443 F.3d 501, 507 (6th Cir. 2006); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005). 29 C.F.R. § 825.220(c) states: "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ."  In fact, "[i]f an employer takes an employment action based**, in whole or in part**, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." Wysong v. Dow Chem. Co., 503 F.3d 441, 447 (6th Cir. 2007)(emphasis added). An employer is thus liable for interference if it uses FMLA leave as one factor in deciding to terminate an employee. Id. at 448.  An employer may be found to have unlawfully interfered with an employee's rights to FMLA leave regardless of the employer's intent.  Saroli v. Automation Modular Components, Inc., 405 F.3d 446, 454 (6th Cir. 2005); Hoge v. Honda of America, Inc., 384 F.3d 238, 244 (6th Cir. 2004).

The Sixth Circuit noted that it has "accepted temporal proximity as a valid basis from which to draw an inference of retaliatory motivation . . . ." Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th Cir. 2010).  The Sixth Circuit has "recogniz[ed] the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." Id. at 401.  The Sixth Circuit has found a period of three months sufficiently close in time to raise an inference of

retaliation. <u>Singfield v. Akron Metro. Hous. Auth.</u>, 389 F.3d 555, 563 (6th Cir.2004). *See* <u>Mickey v. Zeidler Tool & Die Co.</u>, 516 F.3d 516, 524-25 (6th Cir. 2008) (holding temporal proximity alone can establish causation).

Given the close temporal proximity between Plaintiff taking nine days of sick leave for PTSD and her termination, combined with Sgt. Morgan's expressed concern over Plaintiff taking that time in recommending her termination, there is no genuine issue of material fact that Defendant used Plaintiff's FMLA leave as a factor in deciding to terminate Plaintiff. Defendant readily admits in its termination memoranda that Sgt. Morgan's determination that Plaintiff had violated department policy were a basis and, eventually, the penultimate event giving rise to her termination. (City Dep. Ex. 42-44).

For the foregoing reasons, plaintiff is entitled to summary judgment on the issue of liability that Defendant has violated Plaintiff's right to be free from interference in the use of her FMLA leave.

**B.      There is no Genuine Issue of Material Fact that Plaintiff Suffered Retaliation Under the FMLA.**

The FMLA prohibits employers from taking adverse employment actions against employees based on the employee's exercise of FMLA rights. <u>Bryant v. Dollar General Corp.</u>, 538 F.3d 394, 401 (6th Cir. 2008). Absent direct evidence of unlawful conduct, FMLA retaliation claims are evaluated according to the burden-shifting framework used in Title VII discrimination claims. <u>Hunter v. Valley View Local Schools</u>, 579 F.3d 688, 692 (6th Cir. 2009); <u>Bryson v. Regis Corp.</u>, 498 F.3d 561, 570 (6th Cir. 2007).

To state a prima facie claim of retaliation under the FMLA, a plaintiff must show that: (1) the plaintiff was engaged in an activity protected by the FMLA; (2) the defendant knew that the plaintiff was exercising the plaintiff's rights under the FMLA; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. <u>Killian</u>, 454 F.3d at 556. "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to

deduce that there is a causal connection between the retaliatory action and the protected activity." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir.2007).

The Sixth Circuit has held that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007). As is the case with an interference claim, employers may not "use the taking of FMLA leave as a negative factor in employment actions." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir. 2008) (citation omitted).

Given the close temporal proximity between Plaintiff taking sick leave and her termination, combined with Sgt. Morgan's concern over Plaintiff having taken nine sick leave days since she came on shift prior to the Grocery Store Incident, there is no genuine issue of material fact that Defendant used Plaintiff's intent to take FMLA leave as a factor in deciding to terminate Plaintiff.

For the foregoing reasons, plaintiff is entitled to summary judgment on the issue of liability that Defendant has violated Plaintiff's right to be free from retaliation for the use of her FMLA leave.

### III. Conclusion

Plaintiff respectfully requests that the Court grant her motion for summary judgment and direct that this case proceed to trial for a determination of damages.

Respectfully submitted,

/s/ Kerry Knox
Kerry Knox, BPR #23302
117 S. Academy St.
Murfreesboro, TN 37130
(615) 896-1000

/s/ Jerry E. Farmer
Jerry E. Farmer, BPR #017180
1535 W. Northfield Blvd., #8
Murfreesboro, TN 37129
(615) 893-4020

Attorneys for the Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2014, a copy of the foregoing was filed electronically with the Clerk's office by using the CM/ECF system and served through the Court's ECF system.

s/ Kerry Knox
Kerry Knox