# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TONI ALEXANDRA EVOLA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:13-cv-0104** |
| | ) | |
| **CITY OF FRANKLIN, TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | **Judge Haynes** |

## PLAINTIFF'S MEMORANDUM AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Toni Alexandra Evola submits this memorandum and response to Defendant's City of Franklin, Tennessee, ("Defendant" or "the City") Motion for Summary Judgment.

In response to Defendant's Motion for Summary, Plaintiff incorporates herein the facts and legal assertions raised in her own Motion for Summary Judgment (DE 36,37) and Statement of Undisputed Facts (DE 40). Plaintiff renews her argument that the undisputed facts demonstrate that Defendant violated the ADA by discharging Plaintiff based upon a disability and by failing to engage in good faith in the interactive process when to do so would have resulted in a reasonable accommodation, and to reasonably accommodate her disability. Further, the undisputed material facts demonstrate that Defendant interfered with Plaintiff's exercise of her FMLA leave, and /or discharged Plaintiff in retaliation for her use of protected leave.

Plaintiff respectfully requests that the Court grant her Motion, deny Defendant's Motion, and direct that this case proceed to trial for a determination of damages.

## FACTS

Plaintiff began working for Defendant on or about June 17, 2002, as a police officer in the patrol division of the Franklin Police Department. (Deposition[1] of Shirley Harmon ("Harmon Dep.") at 15, l. 20-22; Federal Rule of Civil Procedure 30(b)(6) Deposition of Eric Stuckey ("City Dep.") at Ex. 3; Pl.'s Dep. at 9); (Fact #1)[2]. Plaintiff was elevated to the designation of Field Training Officer ("FTO") with increased pay on October 27, 2006. (Fact #2). Plaintiff received a promotion to Detective, Major Crimes Unit, and Criminal Investigation Division on December 13, 2007. (Fact #3). Plaintiff received positive performance evaluations in her positions as patrol officer, FTO, and Detective, indicating that she was competent to perform the essential functions of her jobs, both before and after she became disabled. (Fact #4).

Beginning in December, 2008, Plaintiff began experiencing a number of unexplainable physical health problems including panic attacks, pain in her limbs, dizziness, shortness of breath, nausea, vomiting, and insomnia. (City Dep. Ex. 32). After an extended period of time being exposed to investigating deaths in her job, and a particularly traumatic incident involving service of a warrant, a member of Plaintiff's family who was very close to Plaintiff died. (Id.; Pl.'s Dep. at 94). In March of 2009, Plaintiff applied for and received FMLA leave and was diagnosed with post-traumatic stress disorder ("PTSD"). (Pl.'s Dep. at 17; City Dep. Ex. 32.). Plaintiff took a period of approximately six weeks off before she was released by her physician. (City Dep. Ex. 4, 22-24, 32).

Stress aggravates Plaintiff's PTSD, and Plaintiff was under a lot of stress in her position with Defendant. (Pl.'s Dep. at 64-65). As a symptom of her PTSD, Plaintiff suffers from interrupted or

---

[1] All materials cited to herein have been previously filed with Plaintiff's Motion for Summary Judgment.
[2] All citations to the record in the form of "Fact #X" refer to the Statement of Undisputed Material Facts filed in support of Plaintiff's Motion for Summary Judgment, which has been previously filed. (DE 40).

fitful sleep and nightmares, which often leaves her groggy and tired when she wakes up in the morning. (Pl.'s Dep. at 63-65). Plaintiff also suffers from panic or anxiety attacks as a symptom of her PTSD. (Pl.'s Dep. at 66). Plaintiff takes Paxil and Benadryl for her disability. (Pl.'s Dep. at 68). Plaintiff takes Benadryl on an "as needed" basis to help her sleep. (Pl.'s Dep. at 68-69). Plaintiff took time off to deal with stress on many occasions after she returned to work from her FMLA leave for PTSD, and filled out the appropriate paperwork and requested FMLA leave whenever she needed to be absent from work due to her PTSD. (Fact # 30). It was the policy of the City of Franklin to assign FMLA leave any time an employee needed time off for illness. (Fact #29).

Immediately upon her diagnosis with PTSD, Plaintiff told her supervisor, Sgt. Don Zelaya. (Fact #8). Plaintiff also told her chain of command and the City, through Human Resources, about her diagnosis. (Pl.'s Dep. at 72; Facts #19-23). Plaintiff would occasionally have to take time off because she suffered from PTSD (Plaintiff's Declaration), and Sgt. Jack Morgan took a negative view of Plaintiff's use of such time off. (Pl.'s Dep. at 24; Facts #27, 45). On March 24, 2009, Plaintiff submitted FMLA paperwork to Defendant indicating that she may require periodic absences from work to deal with her panic attacks. (City Dep. Ex. 22, 23).

After her March 2009 break to manage her PTSD, Plaintiff perceived that she was "under attack" by the department, suffering from "increased scrutiny" even for "unfounded" complaints. (Pl.'s Dep. at 78). On or about July 31, 2009, Plaintiff received a reduction in pay and grade by having her Field Training Officer status revoked, and having her trainee removed from her responsibility. (City Dep. at 42-43, Ex. 11; Moore Dep. at 40; Haufmann Dep. at 15-17).

In October of 2009, Plaintiff investigated a crime of unlawful use of an ATM card. (Pl.'s Decl. at ¶5). After that event, despite her request to be handled in accordance with General Order procedures which would have made a referral to the Employee Assistance Program for counseling,

Plaintiff was scheduled for a psychological fitness for duty examination with Dr. Brenda C. Rambo in November of 2009. (City Dep. at 25-32). The examination found her "fit for duty and ready to return to her position with the Franklin Police Department." (City Dep. Ex 32). Dr. Rambo's examination report, which indicated that Plaintiff had been diagnosed with PTSD, came into the possession of Defendant through Police Chief Jackie Moore, and the Human Resources department, including Human Resources Director Shirley Harmon, who reviewed it. (Moore Dep. at 64-70; City Dep. 95-97; Harmon Dep. at 71-75). Chief Moore testified that it was his policy when officers suffered from stress to weed them out and "terminate them." (Moore Dep. at 33).

On Wednesday, April 20, 2011, Plaintiff went to an H. G. Hills Supermarket shortly before closing and parked her police cruiser in the fire lane adjacent to the storefront for safety and convenience before going inside to try to purchase some food. (Pl.'s Dep. at 112-13; City Dep. Ex. 40). When a young grocery clerk behaved disrespectfully toward Plaintiff over Plaintiff's minor fire lane parking infraction on her way out, Plaintiff left but then returned to explain to the young clerk why Plaintiff had chosen to park in the fire lane. (Pl.'s Dep. at 118). Plaintiff also spoke to the store manager, and recorded the conversation, wherein the store manager told Plaintiff that the manager "was alright with [Plaintiff's] interaction with her employee." (City Dep. Ex. 40). Plaintiff told her supervisor Sgt. Morgan of the incident upon her return to the station, and offered to play the recording. Id. Sgt. Morgan declined to hear the recording and told Plaintiff that the recording would not matter anyway, so Plaintiff deleted the recording in accordance with her normal procedure. Id.; (Morgan Dep. at 25). After giving the interview further thought, Sgt. Morgan decided to make "serious issues" of it. (City Dep. Ex. 38). He informed his superiors and met with Plaintiff and Sgt. Todd Stamper six days later on Tuesday, April 26, 2011. Id.

Sgt. Todd Stamper was Plaintiff's direct supervisor for approximately three years, including at the time of Plaintiff's termination. (Stamper Dep. at 21). Sgt. Stamper prepared Plaintiff's last

performance evaluation, covering the time period from March 1, 2009, until March 31, 2010. (Stamper Dep. at 31). Sgt. Stamper rated Plaintiff from 3.75 (in the middle of the "meets expectations range") to 5.5 (in the "above expectations" to "role model" range). (Stamper Dep. at 32). Sgt. Stamper did not "notice any decline" in Plaintiff's performance after that evaluation. (Stamper Dep. at 41). However, prior to the H.G. Hills event, Sgt. Morgan noted what he called a "decline" in Plaintiff's job performance. (Morgan Dep. at 17). When asked what he observed, Sgt. Morgan stated that Plaintiff had "excess sick leave usage," noting that Plaintiff had "five occurrences of sick leave." (Morgan Dep. at 17-18).

As noted earlier, usage of sick leave automatically invoked FMLA leave at the City. Plaintiff had informed the City through Sgt. Zelaya that she was on medications including Ativan, Paxil, and Benadryl for her PTSD. (Pl.'s Decl. at ¶6). Following her return from FMLA leave for PTSD, most of the times that Plaintiff called in sick, it was approximately an hour before her shift, and she made her superiors aware that it was because she was groggy from the medications. (Pl.'s Decl. at ¶4).

At the April 26, 2011 meeting with Sgt. Morgan and Sgt. Stamper, Plaintiff requested reasonable accommodations from Defendant. (Pl.'s Dep. at 77). Specifically, she requested them to place her in an administrative position. (Pl.'s Dep. at 77; City Dep. Ex. 38,39). Plaintiff also told them that she felt "burnt out," "stressed," and requested their help to find a less stressful position. (Pl.'s Dep. at 77-78, 81-82; City Dep. Ex. 38, 39).

Sgt. Stamper had been trained on how to recognize stress or burnout in subordinate officers. (Stamper Dep. at 12-13). He stated that he was trained to look for changes in appearance and a decline in performance to identify stress affecting an officer. (Stamper Dep. at 13). He also agreed that being a police officer is stressful. (Stamper Dep. at 17). He knew that Plaintiff had suffered from mental health issues and had received professional help for mental health issues prior to May, 2011. (Stamper Dep. at 19-20). He did not refer Plaintiff to EAP and did not document that EAP

had been offered to Plaintiff. (Stamper Dep. at 24-25). Likewise, Sgt. Morgan did not refer Plaintiff to EAP. (Morgan Dep. at 54).

Sgt. Morgan had also been trained to look for stress and burn out in his subordinate officers noting that such disabilities can be identified by "poor job performance, poor decision making, excessive use of sick leave . . . ." (Morgan Dep. at 19). When Plaintiff requested accommodation, however, rather than initiating an interactive process with Plaintiff to search for a reasonable accommodation for her PTSD, Morgan made the decision to begin building a case against Plaintiff for the termination of her employment. (City Dep. Ex. 38). Specifically, Morgan went to the grocery store and solicited the clerk to come in to the station and fill out a complaint. (City Dep. Ex. 45; Morgan Dep. at 19,45 ("Q. So in the six days neither the manager nor the store clerk came to make a complaint to your knowledge? A. That's correct.")).

Plaintiff used two days of sick leave prior to the April 26, 2011 meeting with Sgt. Morgan and Sgt. Stamper. (Morgan Dep. at 21; City Dep. Ex. 38). When they did meet on April 26, 2011, with Plaintiff about the H.G. Hills event, Plaintiff expressed to them that she was "emotionally distressed," she cried, and seemed "despondent." (Stamper Dep. at 45-46; City Dep. Ex. 39). Plaintiff told them that she was "tired" and "burned out." (Stamper Dep. at 47; Morgan Dep. at 28; City Dep. Ex. 38, 39). For Plaintiff to cry in front of him was "a telling point" for Sgt. Stamper. (Stamper Dep. at 48). Sgt. Stamper became "concern[ed]" about Plaintiff, enough so that he asked her to leave her firearm with him. (Stamper Dep. at 46; City Dep. Ex. 39). He perceived that Plaintiff needed "[i]mmediate leave" to address her emotional response. (Stamper Dep. at 50). Sgt. Morgan asked if Plaintiff would like to be placed on administrative duty, such as "working in dispatch." (Morgan Dep. at 28); (City Dep. Ex. 38). Plaintiff said she would like to be placed in an administrative position. (Morgan Dep. at 30; City Dep. Ex. 38, 45).

After meeting with Plaintiff, Sgt. Morgan prepared a memorandum, dated April 26, 2011, in which he criticized Plaintiff for using nine sick days, noted that Plaintiff was not "happy," noted that Plaintiff was suffering from "burn out," expressed a preference to be put in an "administrative" position rather than to be on "street duty." (City Dep. Ex. 38). Sgt. Morgan noted that Plaintiff appeared to be "similar to that of a depressed individual" and was worried that Plaintiff "may not be fit for duty." Id.

Sgt. Morgan told the deputy chief and Chief Rahinsky that Plaintiff was suffering from burnout and had asked to be placed in an administrative position. (Morgan Dep. at 31-32, 34; City Dep. Ex. 38). Later in the afternoon of April 26, 2011, Chief Rahinsky made the decision to suspend Plaintiff upon learning of her request; and ultimately terminated her by letter dated June 9, 2011. (City Dep. Ex. 45). Chief Rahinsky had been trained to understand that "sick leave abuse" is one of the first signs of an officer who may be suffering from depression. (Rahinsky Dep. at 73-74).

Defendant always appoints police officers to administrative positions when those officers have suffered injuries and/or need light duty work. (Pl.'s Dep. at 79; Stamper Dep. at 52; Fact # 46, 47). Sgt. Morgan has observed officers working in administrative positions for lengthy periods of time, up to eight or ten months. (Morgan Dep. at 29-30). Plaintiff was never given the opportunity to attend an EAP, even though she asked for a referral. (Pl.'s Dep. at 105-06).

Sgt. Morgan used the fact that Plaintiff had used nine sick days in the month prior to the H.G. Hills event as a factor in his decision regarding Plaintiff's employment and documented the usage of such time in his April 26, 2011, memorandum he prepared to give to his superiors. (Morgan Dep. at 33; City Dep. Ex. 38). Rahinsky's April 26, 2011 decision to place Plaintiff on administrative leave and to hold a departmental disciplinary hearing was based on Sgt. Morgan's April 26 memorandum in which Morgan expressed concern about Plaintiff's use of sick leave and

which documented Plaintiff's April 26, 2011 request for an accommodation for her disability, and noted that Plaintiff was suffering from "burn out."  (City Dep. Ex. 44, 45).

The increased scrutiny and the attacks that began in October of 2009 finally culminated in the termination of Plaintiff's employment effective June 10, 2011.  (Pl.'s Dep. at 9).  Chief Rahinsky's June 9, 2011 termination letter, which followed the May 19, 2011 departmental hearing by 21 days, stated that the termination decision was based, in part, on Sergeant Morgan's April 26, 2011, memorandum, which memorandum, documented Plaintiff's request to be placed in an administrative position among other things. (City Dep. Ex. 43-45).

Those involved in Plaintiff's termination do not agree who made the decision to terminate Plaintiff.  City Manager Stuckey and Human Resources Director Harmon stated that Chief Rahinsky terminated Plaintiff.  (City Dep. at 130; Harmon Dep. at 124-25).  Chief Rahinsky claimed that City Manager Stuckey made the ultimate decision.  (Rahinsky Dep. at 72).  In any event, Human Resources Director Harmon and City Manager Stuckey reviewed the decision prior to the time it was made.  (City Dep. at 130; Harmon Dep. at 124-25; Rahinsky Dep. at 85).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and all inferences that may reasonably be drawn from the evidence in the light most favorable to the non-moving party. Williams v. Mehra, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).  These requirements are "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993).

## LAW AND ARGUMENT

### I.    Plaintiff's ADAAA Claims

For its argument that it is entitled to summary judgment on Plaintiff's ADAAA claim, Defendant has **only** argued that plaintiff cannot establish a *prima facie* case of disability discrimination "based upon indirect evidence . . . ." (Def.'s Summ. J. Br. at 5; DE 29, Page ID # 110)[3]. According to the Sixth Circuit and the United States Supreme Court, "'[t]he burden of establishing a *prima facie* case . . . is not onerous, but one easily met.'" DiCarlo, 358 F.3d at 420 (citation omitted). *See* Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case . . . is not onerous."); Cline v. Catholic Diocese of Toldeo, 206 F.3d 651, 660 (6th Cir. 2000); EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) ("[t]here must be a lower burden of proof to sustain a *prima facie* case than to win a judgment on the ultimate issue"). Plaintiff satisfies the "easily met" burden.

A plaintiff can establish unlawful discrimination through failure to hire or promote, or through discharge, using either direct or indirect evidence of discrimination. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1184 (6th Cir. 1996). Defendant has not challenged (1) whether Plaintiff has established a *prima facie* case of disability discrimination using direct evidence, (2) whether Plaintiff has established a *prima facie* case of retaliation under the ADAAA, and (3) whether Defendant failed to accommodate Plaintiff's known disability. *See* (Pl.'s Compl. at ¶¶ 39,41)(raising claims for ADAAA retaliation and failure to accommodate). Because they are unchallenged, Plaintiff's claims for retaliation and failure to accommodate must be submitted to the jury.

---

[3] Defendant has not argued its "legitimate nondiscriminatory reason" for suspending and terminating Plaintiff or invoked the *McDonnell-Douglas* burden shifting paradigm.

Because the events in this case took place after January 1, 2009, the ADA as amended by the Americans with Disabilities Amendments Act of 2008 ("ADAAA"). Pub. L. No. 110-325, § 4(a), 122 Stat. 3553 (2008) applies. Wurzel v. Whirlpool Corp., 482 Fed. Appx. 1 (6th Cir. 2012). The three cases used by Defendant in its attempt to analogize the facts in this case to the facts in those cases are all pre-ADAAA.    *See* Hale v. King, 642 F.3d 492, 499-500 (5th Cir. 2011)(specifically noting that the ADAAA did not apply); Noriega-Quijano v. Potter, No. 5:07-CV-204-FL, 2009 WL 6690943, at *5 (E.D. N.C. Mar. 31, 2009)(noting that claims arose prior to the passage of ADAAA); Eibest v. Planned Parenthood of Stark Co., 94 F.Supp.2d 873, 877 (N.D. Ohio 200)(decided 9 years prior to the enactment of the ADAAA).

### A.    Plaintiff Has Established a *Prima Face* Case of Discrimination Using Direct Evidence.

The elements for a *prima facie* claim for disability using direct evidence are (1) that the plaintiff is disabled; (2) that the plaintiff is "otherwise qualified" for the position despite her disability with or without a reasonable accommodation; and (3) the employer bears the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship on the employer. Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 869 (6th Cir. 2007). Direct evidence includes "evidence that the employer relied upon the plaintiff's disability in making its employment decision." Monette, 90 F.3d at 1185-86.

Plaintiff has proffered direct evidence that Defendant relied on Plaintiff's PTSD both in making the decision to discharge her and in refusing to accommodate her disability. Chief Moore testified that it was his policy when officers suffered from stress to weed them out and "terminate them." (Moore Dep. at 33). Chief Rahinsky testified that Plaintiff was terminated out of a concern

for placing the City at risk of incurring liability, rather than consider her request to be placed in an administrative position. (Rahinsky Dep.at 85-88).

In addition to incurring liability for ADA discrimination for discharging and failing to accommodate Plaintiff, Defendant is liable simply for failing to engage in the interactive process in good faith because a reasonable accommodation would have been possible. Lafata v. Church of Christ Home for the Aged, 325 Fed. Appx. 416, 422 (6th Cir. 2009).

### 1. Plaintiff was "disabled" within the meaning of the ADA.

The term "disability" means, (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1)(A)-(C). Since the passage of the ADAAA, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as -- medication . . . ". 42 U.S.C. § 12102(4)(E)(I). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

Plaintiff suffers from PTSD, a mental impairment which even when mitigated with medication affects her ability to sleep. Therefore, her disability affects the major life function of sleeping. See 29 C.F.R. §1630.2(i). When unmitigated, Plaintiff's debilitating PTSD substantially affected her ability to breathe, think, concentrate, communicate, and work. Plaintiff had a record of being disabled by means of Dr. Rambo's report of fitness for duty examination, which came into Defendant's possession in November of 2009. (City Dep. Ex. 32). In addition, Defendant regarded Plaintiff as being disabled because Defendant had received word of Plaintiff's PTSD diagnosis through her immediate supervisor Sgt. Zelaya, through Chief Moore's receipt of Dr. Rambo's report, and through the Human Resources Department's receipt of Dr. Rambo's report.

### a.    Plaintiff was impaired.

Plaintiff's PTSD means that she will live with the condition for the rest of her life.  (Pl.'s Dep. at 68).  PTSD is a mental impairment.  (City Dep. Ex. 22, 32).  Plaintiff's mental impairment substantially interferes with her ability to sleep. (Pl.'s Dep. at 62-69). As a result of her PTSD, Plaintiff suffers from interrupted sleep nightmares, often rendering her "groggy" and "exhausted," requiring her to call in sick to work because she is too tired to work.  (Id. at 64-66).  During one severe nightmare, Plaintiff almost broke her hand because she punched her bedpost during her sleep. (Id. at 63).  Plaintiff's mental impairment, and her consequent inability to sleep, both substantially impaired her ability to report to work and function effectively.  (Id. at 62-69).

 Also due to her PTSD, Plaintiff has experienced panic attacks which prevented her from shopping for groceries, caused dizziness, shortness of breath, and nausea requiring hospitalization which kept her from working, and vomiting which prevented her from sleeping.  (Pl.'s Dep. at 66; City Dep. Ex. 32).  Plaintiff's FMLA paperwork on record with the City indicated she "may have periodic panic attacks which may require absence."  (City Dep. Ex. 22).

There can be no genuine dispute that Plaintiff's untreated PTSD impairment substantially limited the major life activities of sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working when unmitigated with medication and psychiatric therapy.  Id. ("syncope" and "SOB"); (City Dep. at 73 ("SOB" means shortness of breath Ex. 32 at 281; a simple online search of the term reveals "syncope" means loss of consciousness).  Plaintiff got her PTSD under control after she made the decision to check herself into the hospital for diagnosis and treatment, and continued with medication and psychiatric therapy. (City Dep. Ex. 32) (Plaintiff started taking medication and "sees her psychiatrist, Dr. Janes, once every three months.").  Neither the episodic nature of her illness nor the ameliorative measures she has taken can be held against her in determining Defendant's liability.  42 U.S.C. § 12102(4)(D) &

(E)(I).  *See* Hoback v. City of Chattanooga, 2013 U.S. App. LEXIS 25482 (6th Cir. 2013) (upholding ADA discrimination verdict for police officer who brought PTSD under control).

### b.      Plaintiff had a record of being impaired.

The "record of impairment" provision of the ADA is intended to protect "people who have recovered from previously disabling conditions . . . but who may remain vulnerable to the fears and stereotypes of their employers." Equal Opportunity Empl. Comm'n v. Daimler Chrysler Corp., 111 Fed. App'x 394, 404 (6th Cir. 2004) (*quoting* Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 509 (7th Cir. 1998)).  Dr. Rambo's report constituted a medical record, and it was in the possession and awareness of Defendant.  Dr. Rambo's report documented that Plaintiff had a history of a mental impairment that substantially limited one or more major life activities.  (Moore Dep. at 64-70; City Dep. 95-97; Harmon Dep. at 71-75).    Plaintiff, therefore, had a "record of an impairment."  *See* MX Group, Inc. v. City of Covington, 293 F.3d 326, 339 (6th Cir. 2002).  This record came into the City and Chief Moore's possession, and was used in his decision to weed out Plaintiff because of her stress.  Likewise, Human Resource Director Harmon reviewed Dr. Rambo's report at the time it was received, including Plaintiff's Dr. Rambo's recitation of Plaintiff's medical history.  (Harmon Dep. at 72-25).    Plaintiff additionally told her direct supervisor, Sgt. Zelaya, of her diagnosis when she received it.  Plaintiff had to take time off from work time-to-due to her disability, a fact known to Defendant and criticized by Sgt. Morgan. (Pl.'s Decl. at ¶4); (Morgan Dep. at 17-18).

### c.      Defendant regarded Plaintiff as being impaired.

"To be liable under the "regarded as" prong as amended by the ADAAA, a defendant need not regard an individual as substantially limited in a major life activity. 42 U.S.C. § 12102(3)(A). A plaintiff must only show that he was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." Id. Plaintiff's actual impairment - PTSD - was the reason for Plaintiff's discharge.  In Sgt. Morgan's memorandum, which

documents Chief Rahinsky's decision to suspend Plaintiff and which was used in Defendant's termination decision, he noted that Plaintiff appeared to be a "depressed individual" and was concerned that Plaintiff was not fit for duty. (City Dep. Ex. 38). Defendant's perception of Plaintiff as being disabled (i.e., Chief Rahinsky's concern about Plaintiff being a "liability") because of her PTSD was also the reason for its decision to discharge her. (Rahinsky Dep.at 85-88).

### 2. Plaintiff was otherwise qualified for her position despite her disability.

There are genuine issues of material fact as to each of the possible prongs of "otherwise qualified."

### a. Plaintiff was otherwise qualified without accommodation.

The ADA establishes that "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Defendant prepared written descriptions of both the patrol officer job and the job of detective. (City Dep. Ex. 1, 2). Plaintiff's job performance evaluations all established that she was capable of performing her job without any essential function being removed. (City Dep. Ex. 12-20).

After Plaintiff received her PTSD diagnosis in March of 2009, her immediate supervisor Sgt. Stamper evaluated Plaintiff's job performance from the period of March 1, 2009, to March 31, 2010. Stamper's evaluation rated her from meeting to exceeding expectations and even put her in the "role model" range. Stamper remained Plaintiff's supervisor until Plaintiff was terminated in June of 2011. Stamper testified in his deposition, which was taken on December 3, 2013, that after he performed Plaintiff's final evaluation, he did not notice any decline in her performance. (Stamper Dep. at 41). "She was completely back on track." *Id.* Chief Rahinsky testified that Plaintiff generally "did an above expectations consistent performance." (City Dep. at 88).

### b. Plaintiff was otherwise qualified with an essential job requirement eliminated.

Many jobs were available in the department that did not involve stress. Defendant easily could have accommodated Plaintiff by assigning her to a job that entailed less stress than she was enduring as a detective and as a police officer in the patrol division. (Morgan Dep. at 28, 30-32); (Stuckey Ex. 38). Defendant always appoints police officers to administrative positions when those officers have suffered injuries and/or need light duty work. (Pl.'s Dep. at 79; Stamper Dep. at 52; Fact # 46, 47).

### c. Plaintiff was otherwise qualified with a proposed reasonable accommodation.

Plaintiff was "otherwise qualified" to perform as a police officer, as she had served in such capacity for a number of years. (City Dep. Ex. 3, 4, 9, 12-15, 19, 20). Plaintiff was "otherwise qualified" to perform as a detective, as she had served in such capacity for a number of years after her promotion to detective from patrol officer. (City Dep. Ex. 16-18).

If Plaintiff had been afforded the reasonable accommodation of being allowed to "de-stress" from time to time with periods of administrative duty, she could have performed all of the essential functions of her position. (City Dep. Ex. 22 (recommending "followup appointments" and "periodic absences" to cope with stress)). Indeed, Plaintiff had previously "de-stressed" at the time she was diagnosed with PTSD by taking a period of approximately six weeks off. (City Dep. Ex. 4, 22-24, 32). Likewise, Plaintiff could have been placed on Chief Rahinsky's "flex team," which provides relief duty to officers who were injured on the job and needed temporary light duty. (Rahinsky Dep. at 14-17; 27-28).

**3. Defendant cannot sustain its burden of proof either (1) that a challenged job criterion is essential, or (2) that the proposed accommodation would impose an undue hardship.**

Under *Monette*, (1) if Plaintiff could perform the job with an alleged "essential" job requirement eliminated as set forth above, Defendant has the burden of proving that the alleged essential requirement that Plaintiff engage with the public in stressful situations actually was essential, and therefore a business necessity; and (2) on the other hand, if Plaintiff could have performed the job with a reasonable accommodation, Defendant has the burden of proving that Plaintiff's proposed accommodation would impose an undue hardship. 90 F.3d at 1186. If Defendant cannot meet either one of these burdens, Plaintiff is entitled to summary judgment. Defendant cannot meet the necessary burdens in this case.

**a. Defendant cannot prove that it could not provide Plaintiff with a job having periodic stress-free duties, or in which encountering stress, was not an essential requirement.**

Sgt. Morgan testified in his deposition that jobs were available in the Franklin Police Department where stress was not an issue. (Morgan Dep. at 50-51). Rahinsky explained the flex program. (Rahinsky Dep. at 27-28). Sgt. Morgan has observed officers working in administrative positions for lengthy periods of time, up to eight or ten months, so Defendant cannot reasonably argue that allowing some period of time to reduce stress was "essential." (Morgan Dep. at 29-30).

**b. Defendant cannot prove that providing Plaintiff with a less stressful job, or alternative periods of relief from stressful duty, would impose an undue hardship.**

Plaintiff's proposed reasonable accommodations were EAP and/or periodic assignment to administrative duty. Defendant admitted that both of those proposed accommodations were available, and neither of the proposed accommodations would have imposed an undue hardship. The EEOC guidance on *Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (EEOC Oct. 22, 2002) and the *Code of Federal Regulations* provide guidance

on several factors that should be considered in making an undue hardship determination. 29 C.F.R. § I 630.0(p)(2)(i)-(v).  They include: the nature and cost of the accommodation needed; the overall financial resources of the facility making the reasonable accommodation; the number of persons employed at this facility; the effect on expenses and resources of the facility; the overall financial resources, size, number of employees, and type and location of facilities of the employer (if the facility involved in the reasonable accommodation is part of a larger entity); the type of operation of the employer, including the structure and functions of the workforce, the geographic separateness, and the administrative or fiscal relationship of the facility involved in making the accommodation to the employer; and the impact of the accommodation on the operation of the facility.

Rahinsky testified that the City of Franklin was big enough to have some flexibility in its law enforcement workforce.  (Rahinsky Dep. at 27 ("We're a pretty good size.  We've got 125 sworn. The fact that we have a flex team that exists allows us, obviously, to do some things a small agency wouldn't."))  Rahinsky went on to explain:  "On any given day, there's already flexibility in number of people scheduled.  A shift may have 10, 11, 12 people working, but in addition, we may have two traffic units of K9, K9 Sgt., detectives.  So one or two, three, four officers, it's not uncommon to have on light duty or FMLA for reasons, at any given time."  (Rahinsky Dep. at 27-28).

Sgt. Morgan has observed officers working in administrative positions for lengthy periods of time, up to eight or ten months, so Defendant cannot reasonably argue that allowing some period of time to reduce stress was "essential."  (Morgan Dep. at 29-30).  There can be no dispute that Defendant easily could have worked Plaintiff into the flexibility that already existed.

    **B.**     **Plaintiff Has Established a *Prima Facie* Case of Disability Discrimination Through Indirect Evidence.**

Defendant has moved for summary judgment, arguing that Plaintiff cannot state a *prima facie* case for discrimination through indirect evidence.  Defendant is incorrect.

17

To make out a prima facie case of ADA discrimination through indirect evidence, "a plaintiff must show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Whitfield v. Tennessee, 639 F.3d 253, 258-59 (6th Cir. 2011). Defendant only contests the first and fourth elements.[4]

### 1. Plaintiff is disabled.

Plaintiff is clearly disabled and has stated her argument at length in Section (I)(A)(1), *supra*. Plaintiff incorporates her argument as if fully stated herein.

### 2. Defendant knew about Plaintiff's disability.

Dr. Rambo's report constituted a medical record, and it was in the possession and awareness of Defendant. Dr. Rambo's report documented that Plaintiff had a history of a mental impairment that substantially limited one or more major life activities. (Moore Dep. at 64-70; City Dep. 95-97; Harmon Dep. at 71-75). This record came into the City and Chief Moore's possession, and was used in his decision to weed out Plaintiff because of her stress. Likewise, Human Resource Director Harmon reviewed Dr. Rambo's report at the time it was received, including Plaintiff's Dr. Rambo's recitation of Plaintiff's medical history. (Harmon Dep. at 72-25). Ms. Harmon was, of course, involved in the review and decision to terminate Plaintiff. (City Dep. at 130; Harmon Dep. at 124-25; Rahinsky Dep. at 85).

---

[4] Defendant states twice that Plaintiff cannot show that she was terminated "but for" and "because of" her disability. (Def.'s Summ. J. Br. at 6,10; DE 29, Page ID #111,115). Such elements are not part of a *prima facie* claim for disability discrimination, and Plaintiff is not certain what argument Defendant is attempting to make. In any event, Plaintiff cannot respond to such assertions, as they are only conclusory statements, unsupported by any cited facts.

18

**C.    Plaintiff Has Established a *Prima Facie* Case of "Failure to Accommodate," and Defendant Failed to Engage in the Interactive Process.**

Defendant has not moved for summary judgment on Plaintiff's claim for failure to accommodate.  However, if its Motion is read to include such relief, Plaintiff has established a *prima facie* case of failure to accommodate and failure to engage in the interactive process.

### 1.    *Prima facie* case

In order to establish a *prima facie* case of disability discrimination under a "failure to accommodate" theory, the plaintiff must show: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about his disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. Johnson v. Cleveland City Sch. Dist., 443 Fed. Appx. 974, 982–83 (6th Cir. 2011).

Plaintiff has established each of these elements in her argument in Section I(A), *supra*. Moreover, it is notable that immediately following Plaintiff's last request for accommodation (i.e., reassignment to an administrative position), she was suspended on the same day as her request and ultimately terminated.  (Morgan Dep. at 31-32, 34; City Dep. Ex. 38,45).  With such swift action after the request for accommodation, a jury could easily find that the City had no intent to accommodate Plaintiff. *See* Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th Cir. 2010)(discussion of temporal proximity as evidence of employer's retaliatory motive); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir.2004).

### 2.    Interactive Process

The ADA requires the employer to interact in good faith with the employee to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C. F. R. § 1630.2(o)(3). Failure to engage in the interactive

process can result in liability under the ADA if reasonable accommodations would have been possible. Burress v. City of Franklin, 809 F.Supp.2d 795 812-13 (M.D. Tenn. 2011) (*citing* Lafata, 325 Fed. Appx. at 422).

Plaintiff argued extensively in her Motion for Summary Judgment that Defendant is liable under the ADA for failure to engage in the interactive process. Plaintiff will not restate that entire argument; however, Plaintiff reincorporates that argument by reference as if stated verbatim herein. Plaintiff states that the City's lack of good faith in failing to engage in such process is probative of its good faith or intent to accommodate Plaintiff's disability.

### C. Plaintiff Has Established a *Prima Facie* Case of ADA Retaliation.

Defendant has not moved for summary judgment on Plaintiff's ADA retaliation. However, if its Motion is read to include such relief, Plaintiff has established a *prima facie* case of failure to accommodate and failure to engage in the interactive process.

"A retaliation claim under the ADA uses the same framework as a retaliation claim under Title VII." Johnson v. Cleveland City Sch. Dist., 344 F. App' x 104, 113 (6th Cir.2009). To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show that (1) she engaged in a protected activity under the ADA; (2) the defendant knew of her exercise of his protected rights; (3) plaintiff suffered an adverse employment action; and (4) there is a causal link between the protected activity and adverse employment action. *See* White v. Standard Ins. Co., No. 12–1287, 2013 WL 3242297, at *3 (6th Cir. 2013); Carson v. Ford Motor Co., 413 F. App'x 820, 822 (6th Cir. 2011); Cleveland City, 344 F. App'x at 113; Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007). Establishing a case of ADA retaliation is a "low hurdle." Rorrer v. City of Stow, -- F.3d --, 2014 WL 715782, at *17 (6th Cir. Feb. 26, 2014).

### 1. Plaintiff engaged in protected activity.

Plaintiff engaged in the protected activity of requesting a reasonable accommodation. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010). *See* Rorrer, 2014 WL 715782, at *17 (*citing* Sulima with favor); Coffman v. Robert J. Young Co., Inc., 871 F.Supp.2d 703, 718 (M.D. Tenn. 2012)(denying employer's motion for summary judgment on ADA retaliation claim where the protected activity was requesting a reasonable accommodation.

Plaintiff requested reasonable accommodations from Defendant. (Pl.'s Dep. at 77). Specifically, she requested Sgts. Morgan and Stamper to place her in an administrative position. (Pl.'s Dep. at 77; City Dep. Ex. 38,39). Plaintiff also told them that she felt "burnt out," "stressed," and requested their help to find a less stressful position. (Pl.'s Dep. at 77-78, 81-82; City Dep. Ex. 38, 39).

### 2. Defendant knew of Plaintiff's exercise of rights.

Plaintiff requested Sgts. Morgan and Stamper to place her in an administrative position. (Pl.'s Dep. at 77; City Dep. Ex. 38,39). Sgt. Morgan asked if Plaintiff would like to be placed on administrative duty, such as "working in dispatch." (Morgan Dep. at 28); (City Dep. Ex. 38). Plaintiff said she would like to be placed in an administrative position. (Morgan Dep. at 30; City Dep. Ex. 38, 45). Sgt. Morgan told the deputy chief and Chief Rahinsky that Plaintiff was suffering from burnout and had asked to be placed in an administrative position. (Morgan Dep. at 31-32, 34; City Dep. Ex. 38).

### 3. Plaintiff suffered adverse employment actions.

On April 26, 2011, Chief Rahinsky made the decision to suspend Plaintiff immediately upon learning of her request for an accommodation; and ultimately terminated her by letter dated June 9, 2011. (City Dep. Ex. 45).

**4. There is a causal link between the protected activity and the adverse employment action.**

To establish a causal connection, Plaintiff must offer evidence of retaliation, or knowledge coupled with closeness in time that creates an inference of causation. Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir.2000). The Sixth Circuit has stated that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference [of causation]" when the proximity of time is rather short. Id. at 566-67.

Here, the action of the City happened so acutely close in time that one can only infer a causal link. Plaintiff was suspended on the very day she requested an accommodation and ultimately terminated for the same conduct for which she was suspended. (City Dep. Ex. 45). Sgt. Morgan's April 26 memorandum, which ultimately served as the basis and catalyst for all of Plaintiff's discipline criticized Plaintiff for using nine sick days, noted that Plaintiff was not "happy," noted that Plaintiff was suffering from "burn out," expressed a preference to be put in an "administrative" position rather than to be on "street duty." (City Dep. Ex. 38). Sgt. Morgan noted that Plaintiff appeared to be "similar to that of a depressed individual" and was worried that Plaintiff "may not be fit for duty." Id. All of this information was known to Chief Rahinsky either before the Chief recommended or exacted any discipline. (City Dep. Ex. 45; Rahinsky Dep. at 78). In addition, Chief Rahinsky knew that there were allegations that Plaintiff had committed "sick leave abuse," which he knew to be one the first signs of an officer suffering from depression. (Rahinsky Dep. at 73-74). However, the attitude of the City's top ranking officers were that officers suffering from PTSD must be weeded out and terminated (Moore) and that they are a "liability" (Rahinsky). (Moore Dep. at 33; Rahinsky Dep.at 85-88).

## II.     The Family and Medical Leave Act

The FMLA provides eligible employees with up to "12 workweeks of leave during any 12-month period" "[b]ecause of a serious health condition . . . ." 29 U.S.C. § 2612(a)(1)(D).  Defendant is a covered employer, and Plaintiff is an eligible employee.  (Facts ## 29-31; 50).  PTSD is a serious health condition.  (City Dep. Ex. 32).

Under the FMLA's interference theory, it prohibits an employer from "interfer[ing] with, restrain[ing], or deny [ing] the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). Under the FMLA's retaliation theory, it provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

Citing the elements of a retaliation claim pursuant to *Romans v. Mich. Dep't of Human Servs.*, 668, F.3d 826, 842 (6th Cir. 2012), Defendant only moves for summary judgment under the "retaliation" arm of the FMLA, arguing that Plaintiff cannot state a *prima facie* claim.[5]  (Def.'s Summ. J. Br. at 3; DE 29, Page ID #108).  Accordingly, the Court cannot grant summary judgment as to Plaintiff's claim for FMLA interference.

### A.     Plaintiff Has Established a *Prima Facie* Case of FMLA Interference.

To state a *prima facie* claim of interference under the FMLA, a plaintiff must show that: (1) the plaintiff is an eligible employee; (2) the defendant is an employer covered by the FLMA; (3) the employee was entitled to FMLA leave; (4) the employee gave the employer notice of the employee's intention to take leave; and (5) the employer denied the employee FMLA benefits to which the employee was entitled. Edgar v. JAC Products. Inc., 443 F.3d 501, 507 (6th Cir. 2006); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005). 29 C.F.R. § 825.220(c) states: "employers

---

[5] As with Plaintiff's discrimination claim, Defendant only argues that Plaintiff does not state a prima facie claim without invoking the *McDonnell-Douglas* paradigm.

cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ." In fact, "[i]f an employer takes an employment action based, **in whole or in part**, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." Wysong v. Dow Chem. Co., 503 F.3d 441, 447 (6th Cir. 2007)(emphasis added). An employer is thus liable for interference if it uses FMLA leave as one factor in deciding to terminate an employee. Id. at 448. An employer may be found to have unlawfully interfered with an employee's rights to FMLA leave regardless of the employer's intent. Saroli v. Automation Modular Components, Inc., 405 F.3d 446, 454 (6th Cir. 2005); Hoge v. Honda of America, Inc., 384 F.3d 238, 244 (6th Cir. 2004).

The Sixth Circuit noted that it has "accepted temporal proximity as a valid basis from which to draw an inference of retaliatory motivation . . . ." Vereecke, 609 F.3d at 400. The Sixth Circuit has found a period of three months sufficiently close in time to raise an inference of retaliation. Singfield, 389 F.3d at 563. See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 524-25 (6th Cir. 2008) (holding temporal proximity alone can establish causation).

Plaintiff would occasionally have to take time off because she suffered from PTSD, informing her supervisors that her medication made her groggy and unable to come to work immediately, (Pl.'s Decl. ¶4), and Sgt. Jack Morgan took a negative view of Plaintiff's use of such time off. (Pl.'s Dep. at 24; Facts #27, 45). Given the close temporal proximity between Plaintiff taking nine days of sick leave for PTSD and her termination, combined with Sgt. Morgan's expressed concern over Plaintiff taking that time in recommending discipline against her, there is no genuine issue of material fact that Defendant used Plaintiff's FMLA leave as a factor in deciding to terminate Plaintiff. Defendant readily admits in its termination memoranda that Sgt. Morgan's determination in his April 26, 2011, memorandum that Plaintiff had violated department policy were a basis and, eventually, the penultimate event giving rise to her termination (i.e., "sick leave abuse" as stated by Chief Rahinsky). (City Dep.

24

Ex. 42-44; Rahinsky Dep. at 73-74). Accordingly, Defendant's disciplinary actions were "in part" based on the usage of FMLA-protected leave. Wysong, 503 F.3d at 447 (6th Cir. 2007).

**B.    Plaintiff Has Established a *Prima Facie* Case of FMLA Retaliation.**

To state a *prima facie* claim of retaliation under the FMLA, a plaintiff must show that: (1) the plaintiff was engaged in an activity protected by the FMLA; (2) the defendant knew that the plaintiff was exercising the plaintiff's rights under the FMLA; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d at 549, 556 (6th Cir. 2006). "The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).

The Sixth Circuit has held that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007). As is the case with an interference claim, employers may not "use the taking of FMLA leave as a negative factor in employment actions." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir. 2008) (citation omitted).

Given the close temporal proximity between Plaintiff taking sick leave and her termination, combined with Sgt. Morgan's concern over Plaintiff's sick leave usage, Plaintiff has stated a prima facie claim of retaliation.

**III.    Conclusion**

Plaintiff respectfully requests that the Court grant deny Defendant's Motion for Summary Judgment.

25

Respectfully submitted,

/s/ Kerry Knox
Kerry Knox, BPR #23302
117 S. Academy St.
Murfreesboro, TN  37130
(615) 896-1000

/s/ Jerry E. Farmer
Jerry E. Farmer, BPR #017180
1535 W. Northfield Blvd., #8
Murfreesboro, TN  37129
(615) 893-4020

Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2014, a copy of the foregoing was filed electronically with the Clerk's office by using the CM/ECF system and served through the Court's ECF system to opposing counsel, James H. Drescher, 8112 Isabella Lane, Suite 103, Brentwood, Tennessee, 37207.

s/ Kerry Knox